### THE EXPRESS.

### THE A. P. SKIDMORE.

### POWELTON BARGE CO. v. THE EXPRESS AND THE A. P. SKID-MORE.[1]

#### (District Court, S. D. New York. March 30, 1893.)

COLLISION—EAST RIVER—TOWING LIGHTS—LOOKOUT—EXCESSIVE SPEED.

> The steamboat E., going up the East river by night, in the vicinity of Brooklyn bridge, at a speed of 9 or 10 knots, overtook a tug with a tow, and collided with, and sank, libelant's barge, on the starboard side of the tug. Her defense was that the tug was not showing proper towing lights, and that the barge also had no light. *Held*, on conflicting evidence, that the tug and tow were exhibiting the proper vertical towage lights, and that the collision was caused by the lack of a sufficient and competent lookout on the deck of the E., and by the fact that her master and quarter-master were preoccupied by the duties of navigation and the attention given to other vessels,—her speed in excess of the statutory rate also possibly contributing to the collision; that the steamboat, therefore, was solely liable for the collision.

In Admiralty. Libel by the Powelton Barge Company against the steamboat Express and the steam tug Abram P. Skidmore for collision. Decree against the Express.

Hyland & Zabriskie, for libelants.
Page & Taft, for the Express.
Carpenter & Mosher, for the Skidmore.

BROWN, District Judge. At a little after 8 o'clock in the evening of December 24, 1892, the libelants' barge Emma, while in tow of the tug Skidmore, on her starboard side, and going up the East river, at the commencement of the flood, was overtaken by the steamboat Express, laden with some 19 cars, near mid river, and only a short distance above the Brooklyn bridge. Neither the Skidmore nor the tow was seen by the Express until she had approached them within one or two hundred yards, when they were perceived

[1] Reported by E. G. Benedict, Esq., of the New York bar.

nearly directly ahead. The Express was going some nine or ten knots an hour; her wheel was put hard aport and her engines reversed; but her port bow struck the starboard corner of the Emma's stern and the guard of the Express overran and crashed into the Emma's house, so that she sank with her cargo in about 20 minutes. The above libel was filed to recover the damages.

The question turns wholly upon the lights exhibited by the Skidmore and her tow. The captain, the quartermaster, and a man forward on the deck of the Express all testify that the Skidmore before collision exhibited only one white pole light, instead of the two white vertical lights required by the inspector's rules for tugs having tows. They also testify that the single white light, which they did see, was dim and was seen as soon as it was visible, and that it could not be perceived more than the distance above named, i. e. from one to two hundred yards; whereas a proper light, even in that position by the bridge, notwithstanding the electric lights, should be visible at a distance of a mile. The same witnesses also testify that no light was visible on the Emma, which was on the starboard side of the Skidmore; nor on the Jackson, which was alongside on her port side. Both the captains of these boats, however, testify most positively that they each had a white staff light from 20 to 35 feet above the water, and that each was burning brightly. And the witnesses for the Skidmore also testify that at different times, namely, on the start from Jersey City, when off the Battery, and when near the bridge, the usual two vertical lights, properly set, were burning brightly on the Skidmore, although the lower of the two lights was put out by the shock of the collision.

Taking all the circumstances into account, I think the testimony in behalf of the Skidmore and her tows must prevail. The attention of the master of the Express was evidently occupied to some extent with the two other tugs and tows that were coming down from above the bridge just before the collision, a little on his port hand, as well as by a ferryboat coming down near the Brooklyn bridge on his starboard hand. He signaled, as he says, to those tows, and got an answer of one whistle which served for both. But he did not hear, or did not notice, three similar signals given by the Skidmore to the same tugs, though those signals must have been given at about the same time; nor does he seem to have noticed the two separate whistles of those tugs.

The lookout on the deck of the Express was plainly not properly performing the duties of a lookout. The evidence leaves no doubt that there were at least four different craft ahead of the Express, and he did not report one of them. He did not understand it to be his duty to do so. Having no duty to report, there could be little, if any, sense of duty to observe, other vessels; and hence little weight can be given to his testimony in that regard. The signals testified to as given by the Express, were not given until the forward one of the two tows coming down was within three or four hundred yards; and yet the testimony of the Express is that their lights could have been seen under the bridge at the distance of a mile. On the whole, the evidence on the part of the Skidmore and her two

tows is so explicit that I am not warranted in discrediting their statements. It is in the highest degree improbable that three out of four white lights would go out between the Battery and the bridge. I am inclined to think that the glare of the bridge electric lights had something to do with the nonobservance of the lights of the tug and tow, (The A. Demerest, 25 Fed. Rep. 921,) and that the collision arose from the lack of a sufficient and competent lookout on deck, and from the fact that the master and quartermaster in the pilot house were preoccupied with the duties of navigation and the attention given to other vessels, which is confirmed by the failure to notice the Skidmore's three whistles.

I think the lower of the two vertical lights on the Skidmore was put out by the shock of collision, and that they were of the usual brightness, though doubtless dim compared with the electric lights of the bridge, or of the Express. The Express rubbed along the stern of the Skidmore, which projected some 25 feet behind her tows. But this is not, perhaps, material; because even a single red light, properly burning, was sufficient warning to the Express, as an overtaking vessel, not to go so near as to run into the Emma, whether the latter had a light, also, or not. The statute forbids passing nearer than 20 yards; and also forbids a speed of more than 8 miles an hour between the Battery and Corlear's Hook, (Consolidation Act, 1882, § 757;) and those are but reasonable precautions, especially at night. Had she been going at the rate of only 8 miles, she might possibly have avoided collision. I do not find the Skidmore in fault. Decree dismissing the libel as to the latter, and awarding damages against the Express.